UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JEFFREY SCOTT STEINBERG,

                            Plaintiff,

                -against-

KATHI VIDAL, Performing the Functions
and Duties of the Under Secretary of Commerce
for Intellectual Property and Director of the
United States Patent and Trademark Office,

                          Defendant.
-------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**
CV 22-4971 (JMA)(AYS)

APPEARANCES:

Jeffrey Scott Steinberg, Plaintiff Pro Se

VINCENT LIPARI, ESQ.
United States Attorneys Office
Easter District of New York
610 Federal Plaza
Central Islip, New York 11722-4454
Attorneys for Defendant

**SHIELDS, Magistrate Judge:**

Plaintiff Jeffery Steinberg ("Plaintiff") commenced this action against his former employer, the United States Patent and Trademark Office (the "PTO") alleging disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794. See generally Amended Complaint filed herein appearing as Docket Entry herein ("DE") [8]. Plaintiff alleges both direct discrimination and retaliation on account of his disability. Presently before this Court, on referral from the District Court for Report and Recommendation, is Defendant's motion for summary judgment. See DE [42]. For the reasons set forth below this Court respectfully recommends that the motion be granted.

1

BACKGROUND

I.      Basis of Facts Recited Herein

Facts forming the basis of decisions on motions for summary judgment motions are meant to be derived from the parties' competing statements of material fact submitted pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. Consideration of such statements allows the Court to streamline the summary judgment process by identifying facts in dispute, as well as those agreed up by the parties. Parties appearing pro se are not excused from submission of Rule 56.1 statements, so long as the moving Defendant has properly provided the non-moving party with a notice compliant with Local Rule 56.2. That notice has been provided to Plaintiff here. See DE [42] at 3. Despite Defendant's compliance with Rules 56.1 and 56.2, Plaintiff has failed to submit a Rule 56.1 statement. He has instead submitted only a memorandum in opposition to the motion. In deciding this motion this Court will consider that memorandum, Defendant's Rule 56.1 Statement, as well the documents annexed thereto that are properly placed before the Court.

II.     The Parties and Plaintiff's Employment at the PTO

The PTO is the agency responsible for granting and issuing patents, registering trademarks, and disseminating information concerning patents and trademarks to the public. DE [42-2] at ¶ 5. Plaintiff was an employee of the PTO from 2008 until his 2018 termination. Plaintiff was first employed as an Assistant Patent Examiner. Id. at ¶ 7. His duties then consisted of examining patent applications to determine whether they met the statutory and regulatory requirements for the issuance of a patent. Plaintiff was later employed as a Patent Examiner, with the same scope of duties. During the course of his employment Plaintiff was not authorized to approve or reject patent applications. Rather, he reviewed applications and provided comments

2

and recommendations to a Supervisory Patent Examiner ("SPE"). Those supervisors would then provide edits, corrections and comments to Plaintiff's work. When Plaintiff began to work remotely, all such comments and edits were exchanged remotely through the PTO's computer system. Id. at ¶ 8

III.    Plaintiff's Disability

The Court assumes that at all times during his employment at the PTO Plaintiff was disabled in the manner that he describes in his Amended Complaint. As discussed therein and as Plaintiff's employment records and testimony make clear, Plaintiff's disability stems from a severe traumatic brain injury ("TBI") which is traced to a near-fatal car accident that took place on July 22, 1984 - more than twenty years prior to the 2008 commencement of Plaintiff's employment at the PTO. As discussed in Plaintiff's pleading and briefly stated herein, Plaintiff suffered a fracture of the right rear hemisphere of his skull. Since the 1984 accident that resulted in his TBI, Plaintiff has undergone several surgeries. The final such procedure is stated to have healed in August of 2022. Plaintiff states that his gait impairment remains noticeable, but is far less severe than in the past. As his many requests for accommodation discussed below make clear, Plaintiff has, over the years of his employment, experienced difficulty walking. This has impacted his ability to commute to the Alexandria, Virginia office where he was initially employed.

Despite clear and consistent evidence describing Plaintiff's disability as physical in nature, i.e., relating to his ability to walk to and around his place of work, Plaintiff's Amended Complaint states that his TBI seriously affects his ability to process information quickly, and that prolonged interactions result in verbal and physical fatigue. This pleading and the submission of a 2016 physician's note hint that Plaintiff's claimed disability is mental as well as physical. All

of the other factual evidence submitted in connection with the present motion, however, state otherwise. These facts demonstrate that the disability for which accommodation was sought was physical in nature, and in no way impacted Plaintiff's ability to perform his job. Thus, Plaintiff's deposition testimony, self-reported stellar work performance, and the nature of his several years of accommodation requests (spanning from 2009 through 2013) all belie the notion that any mental disability or difficulty interfered with Plaintiff's ability to perform the functions required of the highly technical and skilled work of a Patent Examiner.

Plaintiff's deposition testimony is consistent with the physical nature of his disability. When asked at his deposition whether his disability caused any limitations in his "mental ability" Plaintiff first responded "Yes, I would think so". Deposition Transcript of Jeffrey Steinberg dated 8/27/2024 ("Steinberg Tr."), DE [42-3] at 21:21. However, he clarified that this response referred to a "[l]ack of social interaction because of the way in which people perceive disabled people." Id. at 21:21-23. Plaintiff went on to testify that he did not think that he suffered limitations in mental abilities. Id. at 22:6. Plaintiff's requests for accommodation are also consistent with the fact that Plaintiff's disability affected his abilities to commute and walk around the PTO campus, but did not limit his ability to properly perform his work or communicate with his supervisors.

Plaintiff's testimony as to his work success is similarly consistent with a finding that he did not need any accommodation to address any intellectual or cognitive difficulty when performing his duties as a Patent Examiner.  Thus, Plaintiff testified at his deposition that prior to 2015 he was performing "fantastically well" "was doing great" and that there "was never an issue." Steinberg Tr. at 19:17-18; 34:13; 53:14. He further testified that he did not believe that his disability affected his work performance. Id.  at 21:21-24:22; 34:10-20.

Plaintiff's 2009-2013 requests for accommodation, discussed below, further support the conclusion that he never claimed anything other than accommodation for a physical disability. All such requests for accommodation were granted.

IV.      Plaintiff's Requests for Accommodation: 2009-2013

During the course of his employment Plaintiff made several requests for workplace accommodation. Like his testimony, these requests - which span several years - refer only to physical limitations on Plaintiff's ability to walk. Plaintiff's first requested workplace accommodation was made in 2009. Thus, on August 18, 2009, Plaintiff requested the accommodation of full-time telework to eliminate his walking commute, and to be nearby a kitchen. DE [42-5]. That request was denied because Plaintiff was then a probationary employee. As such, it was necessary for Plaintiff to be in the office for training and to meet with his supervisors. Plaintiff was, however, offered the accommodation of the use of a PTO golf cart within the campus where he worked. He was also allowed to have a refrigerator in his office so that he did not have to walk to a kitchen. Id. at 2. The 2009 request for accommodation indicated no intellectual barrier to performing Plaintiff's work as a Patent Examiner.

In a November 2010 statement in support of his request for an accommodation Plaintiff again alluded to his difficulty in coming to his PTO workplace. He stated that although he lived nearby, it was dangerous for him to walk to work from his home when conditions were icy. He offered "hotelling" i.e., working from home, as the best solution. As a secondary solution he requested a work-issued laptop. DE [42-7]. On January 3, 2011 Plaintiff's request for a laptop was granted. He was also granted the ability to work from home on days when conditions were icy in the area near his office. Later that year, in August of 2011, Plaintiff was issued a second laptop for home office use. DE [42-6] at 4. Like his earlier request for accommodation, the 2010-

2011 documents indicate no cognitive impairment that interfered with Plaintiff's ability to perform his work.

In 2012, Plaintiff again requested the accommodation of working from home on a full time basis. DE [42-8]. That request was made in connection with a program referred to as the "Telework Enhancement Act Pilot Program" (the "TEAPP"). Plaintiff asked for enrollment in the TEAPP that would allow him to work from his New York home. This accommodation was sought to allow Plaintiff to live in close proximity to his New York physician. That physician apparently stated that Plaintiff would benefit from not having to travel to the patent office, even on a monthly basis, due to his medical condition. DE [42-8] at 2. This request was denied on the ground that Plaintiff's disability did not require that he live in New York, and that the PTO need not accommodate Plaintiff's desire to be in close proximity to a particular doctor located in that State. As explained in the denial, the need to work in New York did not entitle Plaintiff to participation in the TEAPP. The denial went on to state, however, that Plaintiff was free to relocate to New York, and thereafter seek to participate in the TEAPP on the same terms as other employees.

In 2013 Plaintiff was finally granted his request to work from his New York home on a full time basis. Plaintiff continued to be granted this accommodation, and was allowed to work remotely from New York until his 2018 termination. To remotely perform his tasks as a Patent Examiner, Plaintiff communicated with other PTO employees via telephone and videoconferencing. Am. Compl., DE [8], ¶ 3; DE [42-2] at ¶ 8.

V.      Plaintiff's Supervision at the PTO

    A.      Supervision by Hjerpe

As a Patent Examiner Plaintiff was supervised by SPE Richard Hjerpe ("Hjerpe"). Plaintiff interacted positively with Hjerpe who supervised Plaintiff from 2008 until Hjerpe's untimely death. The Government does not argue otherwise. Each formal accommodation granted to Plaintiff was granted when he was supervised by Hjerpe. Each was based on Plaintiff's inability to commute to the PTO campus. There is no question but that during that time period Plaintiff never requested any accommodation regarding the way in which he was supervised, or interacted with his supervisors. Indeed, Plaintiff made clear that he had no problems performing the functions of his job, so long as he was allowed to work from home. He states that he was well-regarded by several of his supervisors between 2008 and 2014.

B.     Supervision by Spar and Kumar

The factual basis for the claims of discrimination raised here are traced to the time period when Plaintiff was supervised first by SPE Ilana Spar ("Spar") and then by SPE Srilakshmi Kumar ("Kumar"). Am. Compl. ¶ 12. It was during this period of supervision that Plaintiff's documented performance rating began to drop, leading to warnings and his eventual termination. During this period of time Plaintiff continued to work remotely. He never worked in person with either Spar or Kumar. Steinberg Tr. at 74:3-7. Still, all of Plaintiff's claims of discrimination stem from the way in which Spar and Kumar supervised Plaintiff's work. As summarized by Plaintiff in his Complaint, "[i]t was only when defendant . . . applied a different supervisory method" both by Spar and Kumar" that he "began experiencing significant difficulties in his employment from 2016-2018 -ultimately resulting is his recommended discharge." Am. Compl. ¶ 12.

i.     Supervision by Spar

The genesis of the problems that led to Plaintiff's low performance ratings and eventual dismissal are traced to "an error in technology" used by Spar when reviewing Plaintiff's remote

7

work. Plaintiff complains (in particular and in great detail) about Spar's assignment of "errors" to thirteen of Plaintiff's cases. The "error in technology" referred to in the Amended Complaint is one that prevented Plaintiff from seeing Spar's comments to those thirteen cases. Am. Compl. ¶ 15; Steinberg Tr. at 78:4-79:8. Plaintiff had no doubt that the information technology ("IT") settings he used at home were incorrect. These errors accounted for his inability to see Spar's comments and her consequent assignment of errors to Plaintiff's work. Plaintiff in no way connects these IT errors to any disability; they were simply errors that Plaintiff argues should have been forgiven, but were not. Steinberg Tr. at 79:23-25.

When Spar realized the IT error that prohibited Plaintiff from acting on Spar's comments she is alleged to have forgiven only the thirteenth error, but the twelve previously noted errors were not similarly forgiven, and remained on Plaintiff's work record. Am. Compl. ¶ 22. Plaintiff states that Spar's decision as to the twelve unforgiven errors created a deficit in Plaintiff's work performance from which recovery was, as a practical matter, impossible. Plaintiff therefore argues that it was not fair for Spar to allow twelve of the thirteen errors to remain on his record. While Plaintiff believed that all thirteen errors should have been forgiven, giving Plaintiff a clean slate, he does not connect any disability to Spar's decision. Indeed, Plaintiff testified at deposition that Spar never said anything about Plaintiff's disability. Steinberg Tr. 85:21—86:3.

On June 30, 2016, Plaintiff received an oral warning about his performance. That warning imposed a period of time in which to correct his performance. An August 10, 2016 memo from Spar to Plaintiff confirms the oral warning made to Plaintiff on June 30, 2015. DE [42-12]. On October 14, 2016, Plaintiff received a confirmation of Spar's oral warning. The oral warning period imposed by Spar ended on January 21, 2017. In addition to the warning issued by Spar, Plaintiff's poor performance resulted in revocation of his ability to attend work-related

8

travel to Silicon Valley (the "Silicon Valley Trip"). No demotion or diminution in salary accompanied the cancellation of the Silicon Valley Trip.

During a conversation with Spar regarding the errors and Plaintiff's hiring of counsel to pursue an EEO complaint, Plaintiff remarked to Spar that "this isn't going to work out for both of us." Steinberg Tr. at 116:5-6; 117:5-9. Spar interpreted this language as a threat, which led to a PTO investigation. Id. at 116:16—117:23. The investigation resulted in no finding that Plaintiff threatened Spar. No disciplinary measures were taken. Nor did the investigation result in any loss of pay, demotion or any other adverse consequence to Plaintiff's job.

### ii.    Supervision by Kumar

After Spar's oral warning, Plaintiff met with Tariq Hafiz ("Hafiz"). That meeting took place on July 14, 2015 and is memorialized in a memo from Hafiz to Plaintiff dated the next day. Hafiz confirms therein that he approved Plaintiff's request to be transferred to a new supervisor. As to any disability, the memo states that Plaintiff mentioned that he had a disability, but he did not disclose any details thereof. Plaintiff was encouraged to contact the PTO disability office to pursue any appropriate accommodation. DE [42-13]. On November 7, 2016, Plaintiff's request to be transferred to a new supervisor was approved. As of November 13, 2016 Plaintiff was assigned to report to SPE Kumar. DE [42-14]. Plaintiff was unsatisfied with Kumar's supervision. He testified that her supervision was "aggressive" and that she had personal animosity toward Plaintiff. Plaintiff did not, however, tie any such animosity to any disability. Instead, Plaintiff takes the position that he does not know why he was subject to this aggressive managerial style.

### VI.    2016-17 Requests for Accommodation

9

On June 29, 2016, when Plaintiff was under the supervision of Spar, Plaintiff made a formal request for accommodation. DE [42-9]. Unlike his earlier requests, Plaintiff's 2016-2017 requests did not reference his ability to walk to the PTO campus. Instead, such requests refer only to how he was supervised by Spar and Kumar. Thus, when asked in 2016 to identify what job functions he was having problems performing, Plaintiff did not state any particular function, much less one that could be helped by way of a disability accommodation. Instead, Plaintiff stated only that the quality of his work was "suddenly in question." There is no doubt that was tied to Spar's assignment of errors discussed above. When asked to describe an accommodation that would allow him to perform his job, Plaintiff stated that he had "no idea" what accommodation he sought, but that any such accommodation would have to be permanent.

Plaintiff's June 29, 2016 request for accommodation was accompanied by the physician statement of Dr. Christian Ragnarsson. DE [42-10]. Dr. Ragnarsson's statement is consistent with Plaintiff's earlier and consistent description of his TBI. Thus, the form requesting an accommodation describes Plaintiff's impairment as right side hemiparesis and gait disorder due to traumatic brain injury. DE [42-10] at 4. The impairment is stated to be permanent. As to the major life activities effected by the impairment, the form checks the areas of: (1) performing manual tasks; (2) walking; (3) speaking; (4) seeing and (5) lifting. With regard to limitations that interfere with the employee's performance, the form responds "I don't know of any." This same response is made to the question inquiring as to what job functions the employee has trouble performing because of the impairment. Id. When asked what accommodation would be recommended so that Plaintiff could better perform his duties, Dr. Ragnarsson states that he has "no opinion except employer's understanding of his impairment."

10

On July 25, 2016 the PTO issued a determination as to the June 2016 request. DE [42-11]. That determination notes, consistent with the description above, that Plaintiff did not make a request for a specific accommodation. The PTO therefore denied Plaintiff's request for a reasonable accommodation, noting that neither Plaintiff nor his physician identified an accommodation that would allow Plaintiff to perform his duties. The refusal was without prejudice and encouraged Plaintiff to request an accommodation that he believed would assist him in the performance of his duties. DE [42-11].

On March 7, 2017, while he was under the supervision of SPE Kumar, Plaintiff again filed a request for an accommodation. This request sought a transfer away from the supervision of Kumar as well as a clean slate regarding the twelve remaining errors assigned to his work. This request for accommodation identified a bout of extreme bursitis as the medical condition requiring an accommodation. As a result of this bursitis, Plaintiff took off from work and "failed to recover from Spar's failed management. In connection with this request Plaintiff submitted an updated neuropsychological evaluation by Dr. Dams-O'Connor. Plaintiff visited with Dr. Dams-O'Connor on October 8 and 11, 2016. In her report Dr. Dams-O'Connor reports that Plaintiff suffers from a mild neurocognitive disorder due to his TBI. She recommended that Plaintiff: (1) be allowed extended time periods in which to complete tasks; (2) be allowed a work environment with minimal distractions; (3) receive important work instructions and information in writing (4) be granted frequent nap or rest breaks during the work day and (5) be granted a shift in reporting structure. Two days after the filing of this request for accommodation Kumar issued Plaintiff a written warning of unacceptable performance as discussed below.

On March 27, 2017 the PTO denied Plaintiff's request for accommodation as set forth in the latest request. This denial noted that neither re-visiting Spar's assignment of twelve errors nor

11

a change in supervisors were a form of accommodation required by the Rehabilitation Act. Despite the fact that a change in supervisors is not a form of accommodation, the PTO nonetheless conducted a "reassignment search to determine if a funded vacant position" at Plaintiff's pay grade or lower was available. No such position was identified and on November 20, 2017, the PTO concluded its search effort. See DE [42-22] Plaintiff was also unable to identify a suitable vacant position. Steinberg Tr. at 155:24-156:25.

VII.   Plaintiff's 2017 Work Performance Under Kumar and His 2018 Termination

Plaintiff's work performance and evaluation fared no better under Kumar than under the supervision of Spar. On January 21, 2017, the oral warning period imposed by Spar ended with Plaintiff failing to have reached the required level of performance. On March 9, 2017, a day after Plaintiff's March 2017 request for accommodation - but after Plaintiff had been placed on notice of his poor performance and after expiration of his oral warning period - Kumar issued Plaintiff a "Written Warning of Unacceptable Performance in the Elements of Production and Docket Management" (the "2017 Warning"). The 2017 Warning referred to the earlier warning and stated that Plaintiff had not improved his performance during the fourth quarter of 2016 to the required "Marginal" level. Plaintiff was given a stated period of time to increase his score to reach that level. Plaintiff was warned that the failure to meet this goal could result in his termination. When asked whether the 2017 Warning correctly evaluated and reported deficiencies in his work Plaintiff noted that the evaluation was technically correct, but argued that any deficiency was a result of Spar's earlier improper supervision. Steinberg Tr. at 136:2-7.

On December 11, 2017, after both the PTO and Plaintiff had failed to identify a vacant position for Plaintiff, PTO Technology Center Director John Barlow issue a "Notice of Proposed Removal," proposing that Plaintiff be terminated for failure to meet the Marginal performance

12

level discussed above. DE [42-23]. Plaintiff does not dispute his failure to meet that performance level. He argues only that his failure is traced to Spar's initial and unfair assignments of error. Steinberg Tr. at 136:2-7. On March 5, 2018, Plaintiff replied to the proposed removal, stating that he had a disability that made it hard for him to function under pressure, and he felt that his supervisor displayed animosity towards him. DE [42-24]. However, he did not dispute that he failed to meet the standards imposed by the warnings issued.

In a decision dated June 14, 2018, Assistant Deputy Commissioner for Patent Operations Irem Yucel issued a decision terminating Plaintiff for the reasons set forth in the 2017 Warning. DE [42-25]. This decision noted Plaintiff's failure to meet the required performance level in the elements of Production and Docket Management. Id. On June 18, 2018 Plaintiff emailed his resignation to Kumar, preserving his right to challenge his dismissal in the courts. DE [42-26].

VIII.    Prior Administrative Proceedings

On November 28, 2016, approximately one month prior to this termination, Plaintiff filed a formal complaint of discrimination with the PTO EEO. DE [42-27]. That agency accepted for preservation Plaintiff's claim of disability discrimination on the basis of his TBI, as well as his claim of retaliation for engaging in the protected activity of seeking reasonable accommodations and engaging in the EEO process. Plaintiff complained about being placed on oral warning in October of 2016, which warning prevented him from attending the Silicon Valley Trip; and, since January 2016, and on-going that he was subjected to an ongoing hostile work environment when he was falsely accused by Spar of threatening violence. Also preserved was Plaintiff's claim that he was improperly treated during the process of transferring supervisors and has been improperly verbally counseled for his behavior. DE [42-28].

13

On March 29, 2021, an EEOC Administrative Judge granted the PTO's motion for summary judgment and dismissed Plaintiff's complaint of discrimination. DE [42-29]. On March 29, 2021, a final order affirming this decision was entered. DE [42-30]. Plaintiff filed a second formal complaint of discrimination on September 20, 2018. This claim alleged that Plaintiff was discriminated on the basis of his disability (his TBI) and suffered retaliation when he was terminated on June 15, 2018. On January 24, 2019, the PTO issued a detailed Final Agency Decision finding no discrimination, no denial of any reasonable accommodation and no retaliation. See DE [42-33].

IX.     The Lawsuit and the Referred Motion

Plaintiff filed his first complaint herein on August 22, 2022. DE [1]. An amended complaint alleging discrimination under the Rehabilitation Act was filed on September 13, 2022. DE [8]. On November 7, 2022 the District Court denied Plaintiff's request to further amend his complaint to add a claim under the Americans with Disabilities Act (the "ADA"). See DE [14]. That motion was denied because the ADA does not apply to the Federal Government. Id. The Government filed its answer on February 15, 2023. DE [20]. The parties thereafter filed their joint letter pursuant to this Court's rules, DE [22], and this Court held an initial conference on May 8, 2023. Defense counsel did not appear at the conference. However, a discovery schedule was set ordering all fact discovery to be complete by May 1, 2024. The date for conclusion of expert discovery was set at August 1, 2024. The last day to move for dispositive relief was set at September 1, 2024. See Order dated 05/08/2023.

On May 1, 2024, the date set for the expiration of fact discovery Plaintiff wrote a letter to this Court stating his intention to file notices of deposition and asking the Court to "facilitate these (zoom) depositions and stenography required." DE [25]. On the same day, Plaintiff

14

submitted a request to extend discovery for a period of two months so that depositions could take place "to establish the intentional actions and consequent blatant wrongs done in this case." DE [26]. Plaintiff also filed a letter acknowledging that May 1, 2024 was the last day for fact discovery.  DE [27]. In that letter Plaintiff stated that he did not receive responses to his interrogatories and requests for documents until March 18, 2024, despite having served those requests over a year before - on February 24, 2023. DE [26] and DE [27] (corrected filing to DE [26]).[1] On May 6, 2024, the Government responded to Plaintiff's letters and joined in the request to extend discovery deadlines, asking that the parties be granted until August 1, 2024 to complete both fact and expert discovery. DE [28].

On May 7, 2024, this Court held a status conference to address the requested extension. The Court thereafter denied Plaintiff's pending motions appearing as DE [25-27], but granted the joint request to extend all discovery – fact and expert – to the previously set date for the conclusion of expert discovery - August 1, 2024. During that conference the Court made clear to Plaintiff that the Court does not assist parties with the facilitation of depositions in civil cases, and that parties – including those proceeding pro se - are required to pay and arrange for any depositions they deem necessary. Order dated May 7, 2024. On June 3, 2024 Plaintiff filed as a motion, a document entitled "Rules 36 & 37 Motions - Requests for Admissions & Failure to Make Disclosures." That document included a request to admit, interrogatories and document requests served on the Government. See DE [30]. It reiterated the fact that it took the Government over a year to respond to Plaintiff's discovery requests. Id. The same document was filed by Plaintiff as DE [31]. On June 10, 2024 the Government responded to Plaintiff's

---

[1] Despite the fact that DE [27] is a motion to extend discovery it appears on the docket herein as a "Motion for Issuance of Letters Rogatory". It is unclear whether this filing error was made by Plaintiff or the Clerk's office. In any event, it is clear that DE [27] is a corrected version of DE [26] which seeks a discovery extension.

15

discovery motion. In addition to noting that the newly served request to admit could have been addressed at a deposition (which was never noticed by Plaintiff) and that Defendant had responded to the other discovery requests, it stated that Plaintiff failed to comply with this Court's rules by not making an attempt to confer prior to making the motion. DE [32]. This Court thereafter denied Plaintiff's motion to compel, without prejudice to renewal after reviewing the Federal Rules of Civil Procedure, this Court's rules, and conferring with defense counsel to attempt to resolve any issues. Order dated June 11, 2024. At this point in time approximately two months remained in which to take discovery. Plaintiff made no attempt to notice or take any depositions thereafter. Discovery closed on August 1, 2024.

On September 3, 2024 Defendant requested a pre-motion conference with respect to its anticipated motion for summary judgment. DE [33]. Plaintiff opposed the making of that motion. DE [34 -35]. On November 13, 2024 the District Court waived its pre-motion conference requirement and directed the parties to submit a briefing schedule. On November 27, 2024 the Government submitted its proposed schedule. DE [37]. The District Court ordered the proposed schedule. After granting requests for extensions, the motion was fully briefed on April 18, 2025. On October 21, 2025 the motion was referred to this Court for Report and Recommendation. See Order Referring Motion dated 10/21/2025.

## DISCUSSION

### I.    Legal Principles: Standards on Summary Judgment

Summary judgment is appropriately granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

16

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009). A fact is "material" if it might affect the outcome of the litigation under the relevant law. Id. The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. Celotex, 477 U.S. at 322. Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002) (quoting Celotex, 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all reasonable inferences against the moving party". Tolbert v. Smith, 2015 WL 3875237 *4 (2d Cir. 2015); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise, Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995), and must do more than show that there is "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Instead, the non-moving party must "set forth significant, probative evidence on which a reasonable fact-finder could decide" in their favor. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256–57 (1986).

While the Second Circuit often notes the caution to be employed when deciding whether to grant summary judgment in cases where an employer's intent is at issue, that court has noted similarly that "the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to ... other areas of litigation." Tolbert, 2015 WL 3875237 *4; see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (summary judgment appropriate to avoid "protracted, expensive and harassing trials"); Abdu–Brisson v.

17

Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases"); Kohutka v. Town of Hempstead, 994 F. Supp. 2d 305, 316 (E.D.N.Y. 2014). .

II.     *McDonnell Douglas* Framework

Claims of discrimination, including those brought pursuant to the Rehabilitation Act, whether alleging discrimination, failure to accommodate, or retaliation are evaluated under the familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973); Larnard v. McDonough, 578 F. Supp. 3d 371, 382 (N.D.N.Y. 2022); Livingston v. Roosevelt Union Free Sch. Dist., 2020 WL 1172642, * 6 (E.D.N.Y. January 15, 2020).

Under this framework, the plaintiff must come forward with facts sufficient to establish a prima facie case that adverse employment action took place under circumstances giving rise to an inference of discrimination – whether by disparate treatment, failure to accommodate or retaliation. Larnard, 578 F. Supp. 3d at 382; Kleyman v. SUNY Downstate Med. Cntr., 2020 WL 5645218, *12 (E.D.N.Y. 2020); see Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). The Second Circuit has explained that plaintiff's prima facie burden is de minimis. Abdu–Brisson, 239 F.3d at 467. Nonetheless, in order to state a prima facie case of discrimination, "a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive." Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), aff'd., 51 Fed. App'x 55 (2d Cir. 2002). The burden is not met through reliance on unsupported assertions, Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995), or "[s]tatements that are devoid of any specifics, but replete with conclusions." Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting

18

Bickerstaff v. Vassar College, 196 F.3d 435, 451-52 (2d Cir. 1999). "Evidence leading to the inference of discrimination may include discriminatory comments made by the defendant relating to a disability, failure to take actions required for a disabled employee to return to work, or preferential treatment of employees similarly situated to the plaintiff who are not members of the plaintiff's protected class." Kleyman, 2020 WL 5645218 at *15, quoting, Schneider v. Wal-Mart Stores, Inc., No. 16-cv-2010 (NSR), 2019 WL 294309, at *4 (S.D.N.Y. Jan. 23, 2019).

Once a plaintiff establishes all the elements of their prima facie case, the burden shifts to defendant to "articulate some legitimate, nondiscriminatory reason" for its conduct. McDonnell Douglas, 411 U.S. at 792. Like plaintiff's prima facie burden, defendant's burden of showing legitimate non-discriminatory reasons is similarly "light." Greenway, 143 F.3d at 52. Thus, defendant is required only to "articulate an explanation that, if true, would connote lawful behavior." Id. "The burden is one of production, not persuasion." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

If the defendant satisfies this burden of production, plaintiff's prima facie presumption is rebutted, and "drops from the case." Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 255, 255 n. 10 (1981). The burden then shifts back to plaintiff "to demonstrate by competent evidence" that the reasons offered were "a pretext for discrimination." Id.  At that point, the plaintiff "is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation." Vivenzio v. City of Syracuse, 611 F.3d 98,106 (2d Cir. 2010) (quoting, Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000)); Kleyman, 2020 WL 5645218, at *15 (citing Bailey v. Mount Vernon City Sch. Dist., No. 17-CV-9973 (KMK), 2020

19

WL 1528481, at *12 (S.D.N.Y. Mar. 30, 2020)) (alteration in original). "Pretext may be demonstrated by additional evidence that the employer's proffered reason is not credible or by reliance on the evidence supporting the prima facie case alone." Schneider, 2019 WL 294309 at *5 (citing Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994)). Importantly, the ultimate burden of persuasion as to whether there was intentional discrimination "remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

In the final summary judgment analysis, the court must consider all of the evidence properly presented, and "examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001).

III.     Establishing a *Prima Facie* Case of Discrimination under the Rehabilitation Act

A.     Disability Discrimination

Discrimination alleged under the Rehabilitation Act (the "RA") can take the form of: (1) disparate treatment, (2) disparate impact or (3) failure to accommodate. Davis v. Shah, 821 F.3d 231, 260 (2d Cir. 2016). To establish a prima facie case of employment discrimination under the first two enumerated categories a plaintiff must demonstrate that: (1) the defendant/employer is subject to the RA, (2) they are disabled within the meaning of the Rehabilitation Act, (3) they are "otherwise qualified" for their position, i.e., they can perform the essential functions of the job with or without reasonable accommodation, and (4) they suffered an adverse employment action because of the disability. Natofsky v. City of New York, 921 F.3d 337, 352 (2d. Cir. 2019); Garafola v. Dejoy, 17-CV-01827 (JMA) (JMW), 2022 WL 4642091 (E.D.N.Y. Sept. 30, 2022); Quadir v. N.Y. State Dep't of Labor, 39 F. Supp.3d 528, 540-41 (S.D.N.Y. 2014).[2]

---

[2]     Although not relevant here, retaliation can also form the basis for a claim under the RA.

An adverse employment action is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015). "Significantly diminished material responsibilities" may also qualify as an adverse employment action. Id. As to the element of causation, a plaintiff alleging RA discrimination must show that the claimed discrimination was the "but-for" cause of the claimed adverse employment action. Natofsky, 921 F.3d at 345; see also Stanley v. Phelon, No. 23-731-cv, 2024 WL 1453872, at *5 (2d Cir. Apr. 4, 2024) (applying elements in context of motion to dismiss); Timmer v. City Univ. of New York, No. 20-CV-2554 (PKC) (RLM), 2021 WL 3603465, at *11 (E.D.N.Y. Aug. 13, 2021).

B.    Failure to Accommodate

A plaintiff alleging failure to accommodate under the RA must similarly show that they have a disability and that defendant had notice thereof. Plaintiff must additionally show that they could perform the essential functions of the job with reasonable accommodation, and that defendant refused to make such accommodations. Wallace v. Esper, 2019 WL 4805813, * 5 (S.D.N.Y. Sept. 30, 2019); Kho v. N.Y. & Presbyterian Hosp., 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018); see Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006). A prima facie case of failure to accommodate can be defeated by showing: (1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue. Quadir, 2016 WL 3633406 at *2. While both RA discrimination claims alleging direct discrimination and those alleging a failure to accommodate both require a showing that plaintiff has a disability, claims based on failure to accommodate do not require proof of discriminatory intent. Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co., 955 F.3d 305, 312 (2d Cir. 2020) (citation omitted).

C.    Hostile Environment

21

A plaintiff alleging a hostile environment on account of their disability must show that: (1) their workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment, and create an abusive working environment." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993); and (2) "a specific basis exists for imputing the conduct that created the hostile environment to the employer." Carrasco v. Lenox Hill Hosp., No. 99-CV-924, 2000 WL 520640, at *6 (S.D.N.Y. Apr. 28, 2000) (citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (citations omitted), aff'd., 4 F. App'x 29 (2d Cir. 2001)).

To show discriminatory intimidation, ridicule and insult, the plaintiff must offer facts that would demonstrate that the allegedly hostile conduct was based on his protected characteristic. See Oncale v. Sundowner Offshore Serv. Inc., 523 U.S. 75, 80-81 (1998). 'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimin[ation] . . . because of . . . [a protected characteristic].'" Id. at 80 (quoting Title VII). "Thus, to establish a hostile work environment claim, a plaintiff must be able to show that the conduct in question was motivated by [his protected characteristic]." O'Neal v. State Univ. of New York Health Sci. Ctr., No. 01-CV-7802, 2023 WL 1524664, at *8 (E.D.N.Y. Mar. 24, 2023) (citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("'It is axiomatic that mistreatment at work . . . through subjection to a hostile work environment . . . is actionable under Title VII only when it occurs because of an employer's sex, or other protected characteristic.'") (citations omitted). See also Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) (it is "axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic."); Oyer v. New York State, No. 1:19-CV-01201 EAW, 2020 WL 5642186, at *4 (W.D.N.Y. Sept. 22, 2020) ("For purposes of a claim of a disability-based hostile work environment under the Rehabilitation Act,

a plaintiff must show that . . . the conduct occurred because of [his] disability"); White v. Manhattan & Bronx Surface Transit Operating Auth., No. 18-CV-3627 (GBD), 2022 WL 4227289, at *8 (S.D.N.Y. Sept. 13, 2022) (citation omitted) ("[t]o establish a hostile work environment, a plaintiff must [ ] demonstrate that the discriminatory conduct occurred because of her membership in a protected class").

IV.     Disposition of the Motion

  A.     Plaintiff Has Not Been Deprived of the Opportunity to Take Discovery

Before turning to consideration of Plaintiff's prima facie case, the Court addresses Plaintiff's argument that he has been denied the discovery necessary to defeat the motion. This has not been the case. Indeed, Plaintiff has been afforded ample opportunity to conduct discovery. Plaintiff was afforded the ability to proceed in forma pauperis. He later requested the Court's assistance in bearing the expense of discovery, and was timely advised that the Court cannot provide such aid in civil cases. Plaintiff now argues that he needs to conduct several depositions, but during the time when discovery was open, he failed to notice any such depositions. Importantly, Plaintiff argues that he needs such discovery to provide proof that prior to being assigned to supervisors Spar and Kumar his performance was exemplary. For the purposes of this motion the Court can assume that this is, indeed true. Even assuming that Spar was incorrect in her decision to refuse to give Plaintiff a clean slate after recognizing the IT error, Plaintiff fails, as discussed below, to come forward with a prima face case of RA discrimination.

  B.     Application of *McDonnell Douglas*

  i.     Disability Discrimination

There is no question but that Defendant is subject to the RA. As to disability, the Court assumes that Plaintiff had a disability in the form of deficits resulting from the TBI suffered in

23

1984. That disability existed when Plaintiff was first hired by the PTO and is well documented by Plaintiff's continuing requests to work from home. Plaintiff can thus establish the first two factors of his RA claim. As to the element of adverse action, Plaintiff relies on his termination, as well as the denial of his right to participate in the Silicon Valley Trip and being subject to investigation for harassing Spar. There is no question but that termination constitutes adverse employment action. Wallace, 2019 WL 4805813, *6. The question is closer with respect to the Silicon Valley Trip and the investigation following Plaintiff's comments to Spar. As noted, those events resulted in no adverse employment action in terms of Plaintiff's title or salary. Nonetheless, the Court assumes, without deciding, that these latter two matters also constitute adverse employment action, and turns to the question of whether Plaintiff has otherwise set forth a claim of discrimination. He does not.

First, Plaintiff's claim of discrimination fails because he comes forward with no evidence that he was treated differently from other employees on any basis, including on account of his disability. He similarly shows no disparate impact as a result of his disability. Plaintiff's discrimination case also fails because there is no evidence of discriminatory intent; much less evidence that "but for" his disability he would not have been terminated.

More importantly, and as noted above, Plaintiff can survive summary judgment only if he can "proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive." Bennett, 136 F. Supp. 2d at 246. This requires the articulation of facts "such as any discriminatory comments, to suggest that [the adverse employment action] "occurred as the result of a disability-based animus." Wallace, 2019 WL 4805813 at *7. Neither bald assertions of discriminatory intent, nor Plaintiff's beliefs as to such

disability-based animus are sufficient to defeat a well-supported motion for summary judgment. See id.

Plaintiff argues repeatedly that it was unfair for Spar to begin his downward spiral at work by unfairly assigning errors to thirteen of Plaintiff's cases. Plaintiff's argument nowhere attributes these performance failures to any disability. Even Plaintiff's own testimony - which standing alone would not in any event be sufficient to defeat the motion - fails to support any claims of disability discrimination. While Plaintiff's disagreement with Spar's decision is clear, what is not clear - or even stated - is how that disagreement can be linked to Plaintiff's disability. Thus, Plaintiff nowhere connects any disability stemming from his TBI to the twelve errors assigned by Spar. Instead, Plaintiff took issue only with Spar's supervisory and communication style.

The personality conflict between Plaintiff and Spar (and also between Plaintiff and Kumar) is clear. While the Court can understand that Plaintiff did not get along with Spar and Kumar, and did not agree with their styles of supervision, such disagreements (even in the face of prior stellar performance) do not amount to disability discrimination in violation of the RA. Indeed, Plaintiff points to no evidence supporting any inference connecting these personality conflicts to disability discrimination. Accordingly, these conflicts are insufficient to establish an inference of discrimination on account of Plaintiff's disability. Ultimately, Plaintiff's theory of disability discrimination is based on nothing more than the allegation that he was a disabled employee who was terminated. This is insufficient to support the showing of discriminatory intent necessary to defeat Defendant's motion. Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994); Ochei v. The Mary Manning Walsh Nursing Home Co., Inc., 2011 WL 744738, at *2-3 (S.D.N.Y. 2011) (rejecting "false syllogism" which essentially argues: "I am (fill in the protected

25

class of which the plaintiff is a member); something bad happened to me at work; therefore the bad thing happened because I am (fill in the protected class")). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of disability discrimination.

      ii.      <u>Failure to Accommodate</u>

Any claim of failure to accommodate fares no better than Plaintiff's claims of discrimination. This is because, other than requesting accommodations that were consistently granted, Plaintiff made never made any other claim for a reasonable accommodation was not granted. Instead, all such claims were made for either a change in past decisions regarding the quality of Plaintiff's work, or for a change to a different supervisor. Neither category of change was ever tied to a claimed disability.

A review of all documents before the Court reveals that during the years-long period of time when Plaintiff was requesting accommodations, he never asked for additional time in which to complete tasks, a lower caseload, or that information be presented to him in any particular way to accommodate deficiencies suffered as a result of his TBI. Nor did he make any requests related to the efficacy of the telephone and videoconference equipment provided to him for work. Despite the fact that he never made any requests for accommodation other than the request to work remotely, Plaintiff's Complaint states that between 2008 and 2014 he reported to various supervisors, some of whom provided "reasonable and often minor accommodations". Am. Compl. ¶ 10. The nature of any such accommodation is nowhere documented, even in Plaintiff's testimony. Plaintiff appears to argue that supervisors assisted Plaintiff by "engaging in clear and concise communication, and reviewing patents and edits in a measured and calm and deliberate manner." <u>Id.</u> ¶ 11. Because Plaintiff submits no evidence with respect to any such

26

accommodation the Court will consider that no such accommodation was requested, denied or granted during the period prior to 2016.

After Plaintiff was re-assigned to report to supervisors Spar and Kumar requests for accommodation were made. Yet, even during this period of time, and despite being given every opportunity to document some sort of cognitive disability, Plaintiff states that the only problem he ever encountered at work arose out of the supervisory "style" of Spar and Kumar. Indeed, when asked to identify any particular disability (other than the physical deficits that are well-documented and accommodated) Plaintiff expressed surprise that the quality of his work was questioned and requested either a different position or a permanent change in supervisors.

The 2016 accommodation request, submitted along with the physician letter states that Plaintiff had no idea what would allow him to continue in his position. He did not point to any computer system that failed him. Nor did he seek any alternative way of communicating with his supervisors or timely completion of his tasks.

The only accommodation request accompanied by any medical opinion was that submitted by Plaintiff in 2017. The neuropsychological report submitted in 2017 does not change this conclusion and does not assist Plaintiff in coming forward with a prima facie case of failure to accommodate. That report stated, as discussed above, that Plaintiff would benefit from certain accommodations which he already enjoyed as a result of working from home, or others that were not within the realm of accommodations available under the RA. As such, Plaintiff failed to ever make an accommodation request related to his disability. Thus, any claim of failure to accommodate must be dismissed.

iii.    Hostile Environment

Finally, any claim of hostile environment on account of Plaintiff's disability is denied.

27

Plaintiff alleges that Spar and Kumar created a hostile work environment through criticism of his work, communicating in a "berating, long-winded and confrontational manner," refusing to provide accommodators, "all the while doubling down on making communication more difficult and stressful." Am. Compl. ¶ 54.

However, Plaintiff had no in person interactions with either supervisor. Plaintiff worked remotely from his New York home and communicated with each supervisor, only by audio on his computer and through exchange of writeups and edits and comments y computer. Further, Plaintiff does not believe, and does not show, that either Spar or Kumar, were motivated by discrimination against his disability. Neither supervisor ever commented on his disability to him, nor did plaintiff ever learn that they had made any such comments to anyone else. Thus, in the absence of any showing that Spar and Kumar had any discriminatory intent, Plaintiff's hostile workplace claim fails

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendant's motion for summary judgment, appearing as Docket Entry No. 42 be granted in its entirety.

## OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Further, defense counsel is directed to serve a copy of this Report and Recommendation by overnight mail and first-class mail to Plaintiff at his last known address and to file proof of service on ECF by February 25, 2026.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within

fourteen (14) days may preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

Dated:  Central Islip, New York
        February 21, 2026

                                    /s/ Anne Y. Shields
                                   Anne Y. Shields
                                   United States Magistrate Judge

29